MURRAY McCONNEL, Appellant, v. THE DELAWARE MUTUAL SAFETY INSURANCE COMPANY et al., Appellees.

### APPEAL FROM CASS.

If a party insured, who causes the fire by which his goods were destroyed, by false representations should recover from the insurers, he may be compelled to refund what has been paid him.

Where a cause of action, or a defense, is based upon a charge of crime, to sustain either, the proof must be full and satisfactory.

In cases arising out of insurance policies, where it is necessary to establish facts which show a crime, the same degree of proof is required to sustain the action or defense that would be required to procure a conviction under an indictment for the same offense.

ON the 10th of August, 1853, complainant filed his bill in chancery, in the Cass Circuit Court against the Delaware M. S. Insurance Company, Peter Sweat, David Logan, John Q. Van Ness, Benjamin E. Roney and Charles P. Dunbaugh. The bill shows that on the 5th of May, 1853, Roney was indebted to Goodheart and Ackerland in the sum of about $6,029 for goods; that Roney was then doing a profitable business at Beardstown; that Sweat, pretending to be the agent of the Delaware M. S. Insurance Company, went to Roney's store and charged him with arson, and with defrauding

the insurance company by obtaining from it $4,400; and, under threats of immediate prosecution, demanded from Roney repayment of the $4,400, or security. Roney asserted his innocence, and his ability to establish it. Sweat proposed a private examination, and that there should be no prosecution, and drew up the following paper, to be signed by Roney:

"I, Benjamin E. Roney, do hereby bargain, sell and deliver to the Delaware M. S. Insurance Company, of Philadelphia, the goods, wares and merchandise set forth and mentioned in the foregoing pages of this invoice book (less $821.87 worth sold from the same up to this date), in consideration of and for the purpose of securing said company for the sum of $4,400.50, paid and advanced by said company to said Roney on account of an alleged *bona fide* loss by fire, at Beardstown, on the 10th of February, 1853, of merchandise insured by said company, which loss said Roney claims to be *bona fide*, and which said company alleges to be wrongful. This conveyance is subject to the following conditions: First. The sale of said goods, wares and merchandise is to proceed under the direction and control of David Logan and John Q. Van Ness, as agents of said Delaware M. S. Insurance Company. Second. In the event that, upon an examination, it appears that said money, $4,400, paid to said Roney, as aforesaid, was justly and rightly paid by said insurance company, the above described goods, wares and merchandise conveyed as aforesaid, and the proceeds of sale, after deducting expenses of sale, are to be paid and delivered over to said B. E. Roney.

B. E. RONEY."

Dated this 5th of May, A. D. 1853.

This paper was written in Roney's book of invoices of goods, which, to the amount of $5,000, were then in store, excepting a small amount sold.

Roney, moved by threats and promises of Sweat, signed the paper, and thereupon Sweat caused Roney to be arrested for arson, and, as the agent for said company, took possession of Roney's store, goods, books, papers, etc., including goods, jewelry, etc., not mentioned in invoices. Logan and Van Ness, pecuniarily irresponsible young men, were put in possession of said store, goods, books and accounts by Sweat, and are selling goods on credit. Said goods, etc., are worth about $7,000. One C. P. Dunbaugh is illegally in possession of certain trunks containing jewelry, etc., claiming to retain them, under Sweat, for the same object the goods mentioned in the assignment are held. At the May term, 1853, of the Cass Circuit Court, judgment was rendered in favor of Goodheart and Ackerland against Rooney, for $6,029.88 and costs on above debt; which judgment belongs to complainant.

That an execution was issued on said judgment to the sheriff of Cass county, which has been returned "no property found," and is unpaid. That the Delaware M. S. Insurance Company is a foreign corporation, beyond the reach of process. That the assignment is void.

Bill charges, 1st. That said company is not responsible for taking said goods; is not bound by the acts of Sweat, and has no legal existence.

3d. If the company has the power to do said acts, and is bound by Sweat's acts, yet the company has no means to repay the proceeds of said goods within reach of the process of this court, and the real owner of said goods, by reason of said insolvency, would lose the proceeds thereof.

The bill prays process against said respondents, and calls for their answers; prays that the court decree the assignment void; that the property be sold and applied to pay complainant's debts and costs; that an injunction issue restraining respondents from intermeddling with said goods, debts and accounts; that Logan and Van Ness render an account; that a receiver be appointed; that after he shall have given bond, the injunction issue; that Logan and Van Ness deliver over all effects to the receiver, subject to the order of court, and for general relief.

Answer of Delaware M. S. Insurance Company sworn to by William Martin, president of the company. That Peter Sweat is the general agent of the insurance company in Illinois, and was so constituted on the 20th of November, 1844; that on the 10th of October, 1850, respondent issued a policy of insurance to Roney for $3,500, which policy was twice renewed and increased to $5,000; that on the 10th of February, 1853, the merchandise covered by the policy was destroyed by fire, which policy and renewals are made exhibits. That Roney, by letter of the 10th of February, 1853, notified respondent, through Sweat, of the loss; that by protest sworn to by Roney on the 19th of February, 1853, Roney claimed his loss to be $6,805.60; that on the 28th of March, 1853, respondent paid Roney the sum of $4,400.43, and that payment of the full claim of Roney was refused on the ground that a portion of the property lost, being certain furniture, jewelry and cutlery, was not covered by the terms of the policy. That by a supplemental protest sworn to by Roney, he claimed that of the property destroyed by fire, at the date of the fire, there was furniture of the value only of $107.50, and jewelry and cutlery of the value only of $94.44. That respondent's agent, Sweat, ascertaining thereafter that Roney had caused the fire of the 10th of February, 1853, with the design to defraud respondent, procured from Roney, on the 5th of May, 1853, the assignment and delivery to respondent of certain goods and property, amounting in value to $5,282.86; the assignment being the same set forth in the complainant's bill, and that in procuring said assignment, Sweat did not use threats or other undue means.

Respondent charges that Roney caused the fire of the 10th of February, 1853, and that the loss of his property by said fire was fraudulent on his part, and sets forth various facts evidencing Roney's guilt.

That the property assigned by Roney, and the contents of the store, including property there concealed in the store, were delivered over to respondent on the 5th of May, 1853; that such change of possession was open, notorious and exclusive, and that Roney at no time after the 5th of May, 1853, had or claimed to have any possession of the storehouse or any of the property in it on the 5th of May, 1853; that all the acts of Sweat in the premises were adopted and ratified by respondent; that respondent is solvent.

Respondent admits the rendition of the judgment against Roney, in favor of Goodheart and Ackerland, for the use of complainant for $6,029.84, issue of execution on said judgment and sheriff's return of "no property found," but avers that at the date of the rendition of said judgment, the complainant knew that respondent was in possession of the goods and property in controversy, and that Roney had been arrested for arson. That Roney transferred to complainant, simultaneously with the rendition of the said judgment, goods and property valued at $3,700.

Answer of Peter Sweat sworn to.

His answer shows his agency by the appointment of the 20th of November, 1844; and the facts as set forth in the answer of Martin; that respondent ascertaining that Roney had defrauded the insurance company, went to Beardstown, communicated to Roney his belief of Roney's fraud, and demanded of him to refund the money paid by the insurance company, or to secure its repayment. The answer details the particulars of his interviews with Roney, denying that he made any threats or promises to Roney, and showing that he expressly stated to Roney that he "had no promises to make nor any pledges to give." That Roney, on his own suggestion as to the mode of security, agreed to assign his stock of goods, and did execute the written assignment set forth in complainant's bill; that Roney delivered over, in the presence of his clerks, to the Delaware M. S. Insurance Company, his whole stock of goods, stating to the clerks that they would act as the employees of the Insurance Company until further arrangements were made; that Sweat proposed and insisted upon an immediate examination of the store, and that Roney suggested various expedients to delay the examination; that Sweat made an examination and found concealed in a chest and trunks that were kept locked, many articles of Roney's old stock and goods; that he also found a bill in Roney's

hand writing, dated 2d of May, 1853, headed "B. E. Roney bought of sundries," purporting to be a bill of sale of divers goods bought at Beardstown; that the goods enumerated in this bill were the same goods belonging to Roney's old stock found concealed. The answer further charges Roney with causing the loss by setting the fire of the 10th of February, 1853, with design to defraud the insurance company; setting forth various facts evidencing his guilt. Denies that Roney had possession of the goods or store after the assignment, and shows that the possession of the storehouse and property, as well as that described in the invoice as that concealed, was openly, notoriously and exclusively in the hands of the insurance company from and after the morning of the 5th of May, 1853. That the goods found concealed were delivered over to the receiver, and that he had fully accounted to the receiver for all the property and proceeds of property that had come to his hands. That all respondent's acts as agent were, from time to time, reported and approved. Answer admits the judgment of Goodheart and Ackerland against Roney. Execution and sheriff's return of "no property found," but denies that complainant is an innocent purchaser, showing that complainant bought with full knowledge of the assignment to the Delaware M. S. Insurance Company, and the possession under it, and of Roney's guilt.

Decree of court at November term, 1855. That there be allowed the receiver seven per cent. commissions. That the proceeds of the goods set forth in the invoice book, in which the assignment of Roney was written, less a proportionate part of the expense account, and commissions of receiver, amounting to $3,709.78, be paid to Delaware M. S. Insurance Company.

That the proceeds of goods not set forth in said invoice book, less a proportionate part of the expense account, and commissions of receiver, being $319.53, be paid to complainant, to be applied as a credit on the judgment of Goodheart and Ackerland against Roney.

That one-half of the costs be paid by the Delaware M. S. Insurance Company, and the other half by the complainant.

To reverse this decree, complainant brings said cause to this court.

J. GRIMSHAW and M. McCONNEL, for Appellant.

A. LINCOLN and H. E. DUMMER, for Appellees.

CATON, J. There is no dispute about the principles of law as to the rights of the parties here. The only controversy is

one of fact. This question is an important one, for it involves the inquiry as to the guilt or innocence of Roney of the crime of arson, in burning his store and stock of goods covered by the policy of insurance, and incidentally of the crime of perjury in swearing to a false protest. In such a case every legal presumption is in favor of his innocence, and we should not, by our finding, pronounce him guilty, unless that guilt is clearly established by evidence, excluding or overcoming every fair and reasonable hypothesis of his innocence. The character of the questions involved have increased our solicitude to give it the most careful consideration possible. It has been twice elaborately argued so that we think we have considered it, with the aid of the views taken by counsel on both sides. We are finally constrained to the conclusion that the defense set up by the insurance company is clearly and satisfactorially sustained by the proof, and that Roney himself was the cause of the fire by which his goods were destroyed. It is impossible, in this opinion, without extending it to an unreasonable and unjustifiable length, to go through, in detail, with the immense mass of evidence in the record which has led us to our conclusion, or even to advert to all the material facts and circumstances in proof, but this is the less important, as such a minute discussion of facts could be of little or no value as a precedent, which is the great purpose of reported cases. Some of the leading facts and circumstances which we consider established by the evidence in the case will be stated.

The store, in which the goods were burned, was a one story wooden structure, upon one side of which was an alley into which a door from the back room opened. The ceiling of the store was lathed and plastered, through which there was no access to the attic, which was unoccupied and inaccessible. There was a stove in the front room, the pipe of which was introduced into a brick flue, resting on the joist of the ceiling and extending out through the roof. From a great variety of circumstances shown, we have no doubt that the fire originated in this attic, either from sparks passing through this brick flue, or from Roney opening a hole through this ceiling and introducing it himself. The fire had so far progressed, when it was first observable, through the roof, that the ceiling very soon after fell and precluded the possibility of saving any of the goods in the front store, except a few coats, which were taken out by one of the witnesses, upon his first arrival and immediately before the ceiling fell. A trunk belonging to Logan, a clerk of Roney's, who was then absent, and a Dutch chest and some other packages belonging to Roney, which were in the back room, were saved. Roney slept in the back room alone, and was the only person in the house at the time

the fire occurred, which was about two o'clock in the morning of the tenth of February, 1853. Roney had a policy of insurance, underwritten by the defendant, on the merchandise in this store, and soon after the loss, made out his protest with an invoice of the goods claimed to have been lost, amounting to $6,805.50, of which the defendant paid him $4,400.43, that being the amount of the invoice, excepting the cutlery and jewelry, which it was insisted were not covered by the term merchandise in the policy. This protest was subsequently so amended as greatly to decrease the amount of jewelry and cutlery lost, and increase the loss on goods admitted to be covered by the policy.

As it was possible for this fire to have originated without the agency of Roney, we are bound to presume that it did so originate, unless forced to a contrary opinion, by established facts, satisfactorily and clearly rebutting every such presumption. While it is possible that the fire might have originated from the flue, the lateness of the hour, when it occurred, inducing the supposition that the fire had gone down or gone out in the stove, weakens to a considerable extent at least, the probability that the fire originated from that cause. But this of itself would be far from sufficient to establish the guilt of Roney. In the inquiry before us, we must first look for a motive to prompt him to the commission of the act with which he is charged. The only assignable motive is the recovery from the insurance company of an amount greater than the loss, which he might sustain by the fire. While this is a motive which could only influence a bad man, unrestrained by moral principles, or the fear of punishment, yet we know that it has been sufficient frequently to prompt to the commission of similar offenses, and that too, by men whose previous character would lead to no suspicion, that they would yield to such a temptation. In this case, we cannot resist the conclusion that Roney's protest did show a greater loss of goods, than were actually consumed by the fire. The testimony of Logan shows that the account of goods taken before the fire, was intentionally falsified by Roney himself, and this false invoice taken by Roney, served as the basis for the protest, by which the extent of his loss was magnified. Again, he represented in his protest, as lost, a considerable amount of goods, including cutlery and jewelry, which had been clandestinely secreted, mostly in the Dutch chest, very shortly before the fire, and which was saved. A part of these goods were from time to time stealthily introduced into his store, which he subsequently opened in Beardstown, and mixed up among the other goods, apparently so as not to attract the attention of Logan, who still continued as his clerk, and a part still

remained in the chest and were there found at the time of his arrest.  By these several means we are satisfied Roney exaggerated the amount of his actual loss by more than one-half, and this so connects itself with the only assignable motive for the act, that it prepares the mind at once to expect other evidences of guilt.  And these are not wanting.  As is suggested in the written argument of one of the counsel for the defendant, in his very close and critical review of the evidence, it does appear as if Roney had, for a considerable time, anticipated this fire, and prepared for it.   Indeed, he seems to have made every preparation for it in a deliberate and cautious manner.  If he was to cause the fire, it was necessary that he should be alone when it should be done.  This he carefully provided for, by sending Logan, his clerk, away on a collecting tour, and when he returned before he anticipated and before the fire, in consequence of the extreme cold weather, he insisted upon his going again; against Logan's remonstrances.  Logan's absence was thus secured, when his presence would have disappointed or frustrated his plans.  The witness, Stevenson, had always been very intimate with Roney, and was in his store several times daily, and had always, at Roney's request, staid with him nights, when Logan, his clerk, was absent.  On the night of the fire, he was in the store until ten o'olock, and contrary to his usual custom received no invitation from Roney to stay with him that night, which he particularly remarked.  If Roney had no design in thus securing himself from the presence of Logan or Stevenson on this particular night, it is at least very remarkable and very unfortunate; for we can hardly resist the conclusion that he had a design in being alone on that night, which is indicated by what followed.   On that very night the witness noticed several articles in the show case, in the store, which Roney represented as lost, but which were subsequently found secreted in the chest and trunk which were saved from the back room of the store where Roney slept.  Roney represented to the appraisers that all the articles in the show case were destroyed by the fire, several of which are positively identified, which were found secreted in Roney's possession after the fire, and others, such as pistols, could not be consumed by the fire.  These were searched for in the ruins, at the place where the show case stood, and no vestige of the contents of the show case was left.  They must have been taken out before the fire, and that too, on the very night of the fire, after ten o'clock.

Now, how can we resist the conclusion that Roney set fire to this store himself, when we see that he thus deliberately prepared for it, by securing the absence of all others by a

studied course of conduct, different from his usual habit, by removing the contents of the show case, and other valuable but not bulky articles to places where they could be saved, but not seen; by removing from his safe his most valuable papers, such as notes, etc., which is manifest, from their appearance subsequently, being unchanged and unlike those papers which were in the safe but not consumed; when we see him representing in his protest, supported by his oath, that those very articles which he thus removed and saved were consumed, and collecting, or endeavoring to collect, their value under his policy of insurance; and when we see him further magnifying his loss, by putting in his protest more goods than he had in the store at the time of the fire, and that too by means of a false invoice of stock previously taken? It is said that Logan, who first suspected his fraud and guilt and exposed him to the agent of the insurance company, helped to make this false invoice of stock, and also swore to the protest. This is true, but he explains it satisfactorily. In taking the account of the stock, Logan took down the goods from the shelves and called off the quantities and cost marks, and Roney made the entries in the invoice, which was never carefully examined by Logan, till after the protest was filed and after his suspicious were excited. He then examined it and found that Roney had made false entries in the invoice by entering larger quantities and higher values than he had called off to him, and when he swore to the protest he believed the invoice had been made correctly. This, if not characteristic of a cautious man, is not inconsistent with an honest purpose. Again, it is objected that Roney was a lame man with one artificial leg, and that he was unable to get upon the roof to start the fire there, or to get up and put it through the ceiling, which was all closed. I think the evidence all shows that the fire did not start upon the roof, but that it originated in some way between the ceiling and the roof, and surely there could be no great difficulty in a lame man contriving to get up to a low ceiling, as the character of the house would indicate this was, and knocking a hole through it, and putting any desired quantity of combustible material in the attic, and igniting it at pleasure. And it would also seem that four hours, from ten at night when Stevenson left him alone in the store, till two in the morning, when the alarm of fire was first given, was time enough for Roney, lame as he was, to remove the goods to the trunk and chest in the back room and set the fire in the mode suggested, or possibly in some other mode.

The appearance of Roney, when first seen by those who came to his relief after he gave the alarm, shows that he must

have been previously prepared for the fire and was not taken by surprise, when it occurred. He was first seen immediately after he gave the alarm at the door of the back room trying to get out the trunk and chest about which he evinced extraordinary solicitude, while all else in the store seemed to be forgotten. He said the back room was so full of smoke when he discovered the fire, that he was nearly suffocated, and yet in this pressing emergency he took time to dress himself completely, for he was then dressed throughout, with his watch in his pocket and with his cane in his hand. Now we would naturally suppose, that a man with his infirmity, alone in the house, awakened out of a sound sleep by the smoke of a fire, of the extent and location of which he was ignorant, and so suffocated as to endanger his life before he could get the door open, would take but little time in making his toilet, but would rather be content, to secure the artificial member as a means of locomotion, and then rush to the door out of the suffocation, and give the alarm. It is true, the witness says there was no smoke in the back room when he went in, but I am examining the story of Roney, in connection with his appearance when first seen. It may be, and undoubtedly is true, that he made false representations about the smoke, for the fire was above the ceiling and over another room, and smoke does not usually descend from a fire into a lower room, unless forced to do so, but he made this misrepresentation for a purpose.

I shall not pursue the subject further, although I have only adverted to some of the leading facts, which we think fully established by the evidence, which go to show the guilt of Roney, omitting entirely to advert to a great multitude of corroborating circumstances, all tending to the same conclusion, nor have I felt it my duty, nor do I consider myself justified, to recite the evidence in detail by which those facts are established in our minds. We can entertain no reasonable doubt that Roney set this fire himself, and the decree of the circuit court must be affirmed.

This being a creditors' bill and the funds in the hands of a receiver, a decree will be entered affirming the decree below, and requiring the payment of the costs, both in this court and the court below, by the receiver, out of the funds in his hands which the decree below awards to the insurance company, the court being of opinion that the costs should be paid out of that fund in consideration of the peculiar features of the case

*Decree affirmed.*