THE PEOPLE *ex rel.* Charles S. Deneen

*v.*

ALEXANDER SULLIVAN.

*Opinion filed December 20, 1905.*

1.   EVIDENCE—*crime charged in an information for disbarment must be proved beyond a reasonable doubt.* In Illinois, except in cases of slander and libel, when a criminal offense is charged by the pleadings and must be established to sustain the cause of action or maintain the defense the presumption of innocence arises, and the crime charged must be proved beyond a reasonable doubt; and this rule applies in an information for disbarment of an attorney.

2.   DISBARMENT—*when evidence is not sufficient to justify disbarment.* An information for disbarment charging the respondent with the crime of conspiring with a court bailiff to bribe jurors and inducing the bailiff to abscond to avoid testifying against the respondent before the grand jury, is not sustained where the only evidence tending to sustain the charges is the testimony of the bailiff, which is denied *in toto* by the respondent and is largely discredited by the evidence of apparently disinterested witnesses and by facts and circumstances proven.

INFORMATION for disbarment.

CHARLES S. DENEEN, (ALBERT C. BARNES, RUSSELL WHITMAN, and JOHN L. FOGLE, of counsel,) for relator.

FRANK L. KRIETE, and HIRAM T. GILBERT, (S. S. GREGORY, of counsel,) for respondent.

Mr. JUSTICE BOGGS delivered the opinion of the court:

This was an information filed in this court by the People of the State of Illinois, on the relation of the State's attorney of Cook county, against the respondent, Alexander Sul-

livan, praying that he be required to show cause why his
name should not be stricken from the roll of attorneys and
counselors at law of this State, and, upon a failure of re-
spondent to show such cause, that an order be entered strik-
ing his name from such roll of attorneys.

The petition alleged that the respondent had been guilty
of conspiracies with one James J. Lynch, a bailiff of the cir-
cuit court of Cook county, to bribe and corrupt jurors to
return unjust and corrupt verdicts, and with aiding and in-
ducing said Lynch, after he (said Lynch) had been indicted
for such corrupt practices, to forfeit his bond given to an-
swer such charge and abscond from the State of Illinois, in
order that said Lynch might not be secured to appear as a
witness and give testimony showing the respondent to be
guilty of so corrupting jurors, until the period should expire
within which any such charge against the respondent could
be presented and prosecuted in the courts of the State. The
respondent answered the petition, and the cause was referred
to a master in chancery to take and report the proofs. The
proofs have been reported and the cause submitted upon the
briefs of counsel for the respective parties.

The relator insists that the proofs establish the following
to be facts: That the respondent was the attorney for the
West Chicago Street Railroad Company, which was defend-
ant in the several damage cases in which Lynch had bribed
or attempted to bribe jurors; that this corruption of jurors
was instigated by Alexander Sullivan shortly after January
1, 1897, when he became attorney for said company; that
he had an interview with Lynch at his house and sent him
to Dan Coughlin for that purpose; that subsequently he had
various interviews with Lynch at his office, as cases against
said company came up on the trial calls of the courts; that
he paid Lynch money for corrupting jurors, sometimes in
person and sometimes through a boy messenger who was
sent to the court of which Lynch was bailiff; that Lynch
paid from $50 to $100 to each juror corrupted, getting a

like amount for himself; that this debauchery of the courts of justice, under Sullivan's direction, covered a period of nearly two years while he was attorney for said company; that he paid Lynch in the aggregate during that time over $6000; that the fact of Lynch's connection with the bribery of jurors became public, resulting in his dismissal from office about December 18, 1898; that immediately thereafter he had a conference with Sullivan respecting his defense against prospective indictments; that indictments were so returned against him on December 30 and December 31, 1898; that shortly thereafter Sullivan met Lynch at the office of Dr. St. John pursuant to arrangements and advised him to leave the country, and arranged for subsequent interviews at Frederick St. John's office; that subsequently he sent Murray to bring Lynch to Sullivan's house, where he promised to indemnify Lynch's bondsmen against loss and to provide for the support of Lynch and his family during his absence; that Lynch, questioning the propriety and motives of some of Sullivan's propositions, failed to go as promised; that his bondsmen desired to be released, causing Lynch to go to Frederick St. John's office, as advised by Sullivan; that there he again met Sullivan, where each charged the other with failing to keep his promises, and arrangements were made that Frederick St. John would see to the settlement of the bond question; that immediately thereafter interviews were had with Frederick St. John and others, resulting in leaving with Lynch on January 20, 1899, the day of his departure, the sum of $4000 to remunerate his bondsmen and $75 for Lynch's wife; that that night Lynch and Mulligan, his cousin, departed for Canada; that Lynch, failing to receive money as expected, and being sick, went to Mankato, Minnesota, where he remained for a few days, communicating in the meantime with Edward Maher (his, Lynch's, attorney,) through Mulligan; that under the advice of Maher he, about February 8, returned to Toronto, Canada, having furnished Maher his assumed name and house address with

the expectation of meeting Maher there; that Frederick St. John appeared, instead of Maher, with a proposition, purporting to come from Sullivan, that Lynch go to Guatemala, from which he could not be extradited, and that he would receive $2000 aboard a vessel when leaving Liverpool for that place and $3000 additional would be deposited with an acceptable person in case his absence should become necessary for a second year; that the fact of an unknown man accompanying St. John led Lynch to distrust the real character of his mission and caused his and Mulligan's immediate return to Chicago February 20, leaving St. John with the expectation of meeting Lynch the next morning; that Lynch remained in concealment in Chicago with friends, communicating directly with his sister, Mrs. Gordon, and through her with Maher and St. John; that Lynch, on the promises brought through the same channels, returned to Toronto about March 9; that Edward Maher shortly afterwards visited him there, and endeavored to restore his confidence in Sullivan and St. John and to pursuade him to accept the Guatemala proposition, but brought no money as expected by Lynch; that Lynch there repudiated him as his attorney; that Lynch then sent for his sister, Mrs. Gordon, and money; that she went to see him, and shortly afterwards, unexpectedly to him, made a second visit at the instigation of St. John to persuade Lynch to accept the Guatemala proposition; that Lynch resented her coming, claiming she came at the expense of St. John and Sullivan, who, as he claimed, had failed to keep their promises to him, causing her immediate return to Chicago; that thereupon Mrs. McGuirk obtained Lynch's address from his sister, saying Sullivan wanted to see him, and visited Lynch to persuade him, in Sullivan's behalf, to take some position that would be obtained for him in Montreal, to which Lynch submitted a counter-proposition; that shortly afterwards Mrs. McGuirk made a second visit, submitting plans and propositions altogether unacceptable to Lynch; that Lynch then changed his place of con-

cealment to New York, whence he communicated with his sister, Mrs. Gordon, and a friend, Dennis Ryan; that Mrs. Gordon then resumed negotiations with Maher and St. John to bring about some financial aid, Lynch having up to that time (June, 1899,) defrayed his own expenses while away; that on June 23 a written proposition dictated by St. John was transmitted to Lynch for signature, providing for the payment to Lynch of $150 per month from July 1, 1899, to January 1, 1902, and deposit of a sufficient sum of money for such purpose in the hands of an acceptable person; that Lynch· returned the document unsigned, with a similar one signed, designating Dennis Ryan as the depositary of such fund; that Ryan and Mrs. Gordon and Frederick St. John consummated such arrangements; that St. John delivered $4500 to Ryan, and that the latter thereafter paid $150 per month to Mrs. Gordon for transmission to Lynch, payments of which were made to him until the month of September, 1901, when the balance of $450 was, at the request of St. John, returned to him; that in October Lynch returned, surrendered himself and appeared before the grand jury, when the aforesaid indictment for conspiracy was returned.

That Lynch was guilty of bribing, or attempting to bribe, jurors to render unjust and corrupt verdicts favorable to the West Chicago Street Railroad Company in two cases, is shown by the proof. Lynch testified he had bribed, or attempted to bribe, jurors in many cases,—twenty-five to forty,—but could name five of such cases. He testified that the respondent instigated him to the commission of these corrupt practices and paid him the money which he paid to the jurors, sometimes $50, sometimes $100 each, and also paid him a like sum of money to be retained by himself in each instance. The respondent appeared as a witness, was fully examined and cross-examined, and denied these statements of Lynch in general and in detail. It is contended that Lynch's statements are in some instances corroborated by other witnesses or by facts and circumstances appearing in

the proofs. The evidence is very voluminous, and reference to such portions of it as are relied upon to corroborate Lynch will be sufficient for the purposes of this opinion.

Lynch testified that some of the sums of money so, as he alleged, paid to him by the respondent were paid to him in the respondent's office, some in the court house in person by the respondent, and that other payments were sent to him in sealed envelopes and carried by one Robert Hill, office boy of the respondent, but would not specify when or where any alleged specific payment of money was made. The payments alleged to have been sent by Hill are relied upon as corroborative of Lynch's testimony. The offices of the respondent were in the Chicago Opera House block, which is directly across Washington street from the court house, in which Lynch was employed as bailiff. Hill testified that he saw Lynch in Sullivan's office quite frequently,—sometimes two or three times a week; that he saw him talking with Sullivan; that he took verbal messages to the court room from Sullivan to Lynch "that Sullivan would like to see him," and carried sealed envelopes from Sullivan to Lynch in Judge Clifford's court room once or twice a week, and that when he delivered the envelopes Lynch put them in his pocket. Hill did not know what was contained in any of the envelopes. The respondent admitted that he had sent sealed envelopes to Lynch by Hill on two occasions; that one time the envelope contained a letter relative to a position to which Lynch sought to have his brother appointed and to which he was subsequently appointed, and another time respondent sent in an envelope some tickets or printed matter connected with the election of one of the judges of the circuit court which Lynch had requested to be sent to him, and admitted that Lynch came to his office at times to notify him that motions pending in cases in which he was engaged as an attorney were to come up for hearing, but denied that Lynch ever came to his office for any improper purpose. On cross-examination Hill, with reference to the number of envelopes which

he had carried from the respondent to Lynch, testified: "I could not say whether I took letters of anybody else from Mr. Sullivan's office and delivered them to Lynch. I could not say whether I did or not. I made no record of them. I do not know how many of them were from Sullivan or how many of them were from anybody else. Anybody that came and asked me to deliver a letter for them I would put on my hat and deliver it, whether for Mr. Sullivan or anybody else in the office. It made no difference to me. I delivered letters and notes for other people in the office and for other people in the building—lots of them—for anybody that asked me. I don't know how many letters I delivered for these people to Lynch. I think I have delivered letters to Lynch from other people. Maybe I have and maybe I have not. I think I have. I could not give the number of letters I have delivered, nor the dates, nor anything that occurred between him and Mr. Sullivan or anybody else about delivering them. Perhaps Miss Schottler, who was in Mr. Sullivan's office, would send me over to Mr. Lynch with a note to him from herself. I would not say she has not. I never made any memorandum. Anybody come and asked me to take a letter, I put it in my pocket and delivered it. Perhaps she has sent me over with a letter about the employment of Lynch's brother. I would not say she has. I don't know whether I took anything else over to Mr. Lynch except those notes from Mr. Sullivan and other people in the office there. I may have delivered packages. I would not say that I did and would not say that I did not. I have no recollection on that subject. As to these notes that I carried to Lynch, I am not able to say how many of them came from Sullivan or how many came from other people. I don't know anything about the purpose of them. I don't know how many packages of tickets I carried to Lynch from Sullivan's office. I always got my messages and went and delivered them. I never kept any memorandums at all. If Mr. Sullivan gave me a note to deliver to anybody I went

and delivered it, and that is all I did. I didn't put it down in a book. There was no occasion to recollect it. All I have now is a general hazy recollection that I did go and deliver these notes." He further testified that the respondent never told him to conceal any envelopes that were to be given to Lynch, and that he never attempted to give them to Lynch secretly; that he would go up and give them to him in the court room in Judge Clifford's court; that sometimes Lynch would come to the railing of the court room and get what he had to give him, and sometimes he would give what he had to give Lynch when he was sitting at his desk, right beside the judge's desk, and sometimes he would lay them on the desk and Lynch would pick them up. Lynch testified: "He brought me the money in a sealed envelope and delivered it to me in the hallways; sometimes in my court room, provided it was the lunch hour and there was no one in there." In his examination in chief Hill stated that the envelopes were sealed, and on cross-examination he said he never noticed to see whether they were sealed or not, and could not state whether they were sealed or not.

Lynch testified that he was frequently in the office of the respondent, and that the respondent often paid him money for corrupting jurors in his office; that he was in respondent's office so often that the employees therein began to notice it and that it looked suspicious, and that respondent began to send the money by Hill, but that "I was not surprised the first time that I received money in that way. I can't state whether I was expecting it. I don't remember whether I had, prior to the first time that Hill brought over money in an envelope, had any conversation with Sullivan in which he intimated to me that he was going to send money over by Hill;" that the money brought by Hill was in greenbacks,—sometimes large ones, sometimes small ones; that "most of the bills were small bills, if you call a $20 bill a small bill. Some were $50. I don't think there was any $5. I don't think we got down as low as that. We were dealing

in big money." Again he testified that the bills were generally small, because "Mr. Sullivan was always afraid of a man (a juror) getting up in the neighborhood with a large bill, that the grocer and butcher would become suspicious of him, and consequently I tried to give them (jurors) small bills, so that if a man went into any place he would have a five or a ten-dollar note, because naturally otherwise the butcher and the baker and the grocer would become suspicious."

It was shown that a brother of Lynch had a position in the office of the street railroad company and occupied an office in the same suite of offices occupied by Sullivan and others connected with the legal department of the company, and that Lynch at times went there to see his brother; that he had gone there at other times to deliver messages of information relative to motions and cases pending in the court, as claimed by respondent. That he was there frequently, and had opportunities to see the respondent and arrange for the bribing of jurors and to receive money from respondent therefor, was well established. That he did so rested on his testimony and was denied *in toto* by the respondent.

It is quite unreasonable to believe that the respondent would send money in amounts from $100 to $400 in currency in an envelope by an office boy to be delivered to a bailiff in the court for the purpose of corrupting jurors without first having arranged with the bailiff to receive the money in that way, and equally unreasonable that the boy would be entrusted with sums of currency so to be used without warning him to exercise care in carrying and delivering the same, and all of this is rendered still more unreasonable when the bailiff, it is remembered, had such ready and frequent opportunities to see the respondent and receive the money secretly. That Hill carried envelopes from the respondent or from other persons in his office to Lynch was proven, but that these envelopes, or any of them, contained currency sent by the respondent to Lynch to be used in payment of jurors

rests upon the testimony of Lynch alone, is denied by respondent, and the probabilities of the dispute are not with Lynch, but with the respondent.

That Lynch had a conference with the respondent very soon after his corrupt practices were exposed, which was about December, 1898, was not denied by the respondent. Lynch testified that at that conference respondent advised him with reference to the course to be pursued and told him that the trouble would soon blow over; advised him to do no talking, and to go and see one Edward Maher, an attorney, and to also see Ross & Fitzpatrick, who were operating a detective agency. This conference was arranged by telephone. One Richard W. Megary, now claim adjuster for the London Guarantee Accident Company and then engaged in legal work for the Union Traction Company, testified that he was in respondent's office and answered the phone; that Lynch asked if Sullivan was in his office, and being informed that he was, said he would come over at once; that he (Megary) advised Sullivan that Lynch was coming, and Sullivan asked him (Megary) to remain in the room while Lynch was there, and Megary testified he did remain in the office and heard the conversation which occurred. Megary testified: "Lynch said: 'Mr. Sullivan, I suppose you have seen the papers. They are after me on the North Side, and I want you to defend me.' Mr. Sullivan said to him: 'Lynch, I cannot defend you. I have not been in the criminal business for a number of years and I am totally unfamiliar with that class of work. You have been around the courts long enough to know somebody who could defend you. I absolutely refuse to have anything to do with it.' I do not recollect anything else that was said. Lynch asked Mr. Sullivan if he could recommend somebody to him, and Mr. Sullivan then said: 'No, you have been around the courts long enough to know lawyers; you ought to know somebody to take your case for you.' Nothing was said in that conversation about the employment of Edward Maher as an at-

torney, and nothing was said in that conversation about employing Dan Donohoe. I have seen in the newspapers about the time that this thing came out, and this interview was shortly after that. That is as close as I can come to it. I was there during the entire interview betwen Lynch and Mr. Sullivan." The respondent gives the same version of the interview. Miss Schottler, stenographer for respondent, testified that she was at her station in the reception room of respondent's office, and that Megary was there when the telephone rang and answered it, and that he remained in the office with respondent and Lynch, and was there when Lynch went away. Lynch, here again, not only fails of corroboration, but his testimony is directly contradicted upon material points by one who, so far as the record shows, was a disinterested witness. The truthfulness of respondent's version of the interview is sustained by the same witness.

The next alleged circumstance relied upon to connect the respondent with Lynch as the corrupter of jurors, and also as a conspirator in the matter of urging Lynch to abscond so that he could not be obtained as a witness until after the time had elapsed in which a prosecution could be maintained against respondent, is an alleged interview which Lynch testified was had between himself and respondent at the office of Dr. Leonard St. John. Lynch testified that respondent notified him by telephone to go to Dr. St. John's office and he would meet him there; that he (Lynch) was accompanied by his cousin, Phillip Mulligan, a young man about twenty-one years of age; that he and Mulligan went to Dr. St. John's office on January 2 or 3, 1899, and waited in the doctor's reception room; that he (Lynch) was called into the doctor's private office, and that soon after the respondent came in, and that they (Lynch and respondent) were shown into an adjoining private office and there had a private corversation; that the respondent urged him (Lynch) to go away,—to leave the State; that he (Lynch) told respondent he had given bond and would not go unless his

bondsmen were protected; that respondent promised to see what he could do about the matter of protecting the bondsmen. The pertinency of this testimony is rendered more apparent by the claim of the relator that the bondsmen were afterwards protected and that he fled to Canada. Mulligan sustained Lynch to the extent of testifying that he went with Lynch to Dr. St. John's office; that they went into the reception room; that Lynch introduced him to the doctor at the door of the doctor's private office, and that Lynch went into the doctor's private office. The respondent denied that he ever sought to have Lynch go away, and denied that he arranged to meet him at Dr. St. John's office or that he ever did meet him there. Dr. St. John denied that Lynch and respondent had the interview as testified to by Lynch. He further testified that on the day Lynch claimed he met respondent at his office, he (the doctor) received a note written by Lynch, saying that it would not be possible for him (Lynch) to bring a boy to the doctor's office for treatment on that day as had been arranged, and that he would bring him on a later day. The written note was produced in evidence.

Lynch and Mulligan testified that Mulligan had but recently been mustered out of the United States army and was wearing his uniform on that day. Dr. St. John denied that Lynch introduced him to any one dressed in a soldier's uniform on that or any other occasion. Mrs. E. J. Young testified that at the time in question she was in charge of Dr. St. John's reception room; that she was on duty from 9 A. M. until 6 P. M., and did not go out for lunch; that Lynch and his wife were patients of the doctor and that she knew them both; that Lynch was not there at any time accompanied by a boy or young man dressed in soldier's uniform; that no one dressed in such uniform waited in the reception room on that day. Mrs. Mamie Anglin testified that she was the nurse in charge of the inner rooms of the doctor's office at the time in question, and that the doctor did not meet Lynch at the door of his reception room and

receive an introduction to a young man in a soldier's uniform. James A. Fraser, Mrs. Phillipine Trout, Charlotte H. Morrison, Mrs. Agnes McGrath, E. C. Anderson and Mrs. Louisa March all testified that they were in the reception office of Dr. St. John on January 3, 1899, at the time when Lynch claimed to have called there, and that neither of them saw any man dressed in a soldier's uniform come into the office. Dr. Copeland had an office which could be entered from the same corridor as that leading to Dr. St. John's office and also by a private hallway from Dr. St. John's office. Dr. Copeland testified that he was in his office on that day and that he did not leave it January 3, 1899, before two o'clock in the afternoon, and that when he did leave it he left it in charge of Mrs. Anglin, and that there was no conference in it between Lynch and respondent.

An unprejudiced consideration of all of the testimony relating to the alleged meeting of respondent and Lynch at the office of Dr. St. John fails to satisfy the impartial mind that the claim of Lynch that respondent was there has the support of a preponderance of the proof.

Lynch testified that he had an interview with respondent at the office of Frederick St. John with reference to the matter of protecting his bondsmen, and this is the next alleged incriminating circumstance. The respondent, on oath, denied that such an interview occurred or that he was at the office of Frederick St. John. The testimony of Mulligan is again relied upon to corroborate Lynch. Mulligan testified that respondent came into the office of Mr. St. John and with Lynch went into an adjoining room, but on cross-examination he admitted that he had never met and did not then know respondent and was not at that time introduced to him.

Lynch testified that he had a meeting with respondent at Ross & Fitzpatrick's detective agency; that they had a conversation relative to trying to get information as to the action of the grand jury through certain members thereof. The respondent denied that he ever met Lynch at the de-

tective agency or ever had any such conversation with him. F. R. Buckminster, superintendent of said agency, testified that he was there at the time Lynch came to the agency and that the respondent was not with him there; that Lynch was at the agency twice, but at one time he was alone and at the other he was accompanied by Edward Maher, and that respondent was not with him on either occasion. These repeated denials of Lynch's statements by uninterested witnesses tends strongly to discredit his truthfulness.

Lynch testified that he had an interview with the respondent at the latter's house, and that respondent suggested plans for the departure of Lynch and for the protection of his bondsmen, etc. The respondent denied that Lynch was ever at his house or that any such conversation occurred there or anywhere else. The testimony of the same witness, Mulligan, and also that of one Hawley, who was also a relative of Lynch, is thought to corroborate Lynch to some extent. These witnesses testified that they understood Lynch, accompanied by one Murray, was going to respondent's house, and that they followed for a short distance and waited at a street corner until Lynch returned and then went home with him. But these witnesses, according to their statements, did not go within fifteen blocks of the respondent's home or know where Lynch went, other than what was said by Lynch. Mrs. Lynch, wife of James J. Lynch, gave testimony as to this alleged incident which cannot be reconciled with the testimony of Lynch as to conversations at the house of Lynch. Said Murray was indicted with respondent and others for conspiring to induce Lynch to abscond, etc., and he pleaded guilty to the charge. He was not called as a witness by either party to this proceeding. That this alleged interview occurred, therefore rests alone upon the testimony of Lynch, whose statements made as to former alleged occurrences, when contradicted by the respondent, have, as we have seen, been uniformly overcome and disproven whenever third persons who might testify were present.

It may be here appropriate to note that William E. Lynch, a brother of said James J. Lynch, testified that he knew the reputation of said James J. Lynch for truth and veracity in the neighborhood in which he lived; that such reputation was bad, and that from such reputation he (the witness) would not believe him under oath.

Lynch was further discredited and his testimony as to the connection of the respondent with the alleged jury bribing rendered unreliable by proof of statements made by himself to others. John T. Smith testified as follows: "I reside in Chicago. I was born and raised here. I am claim agent for the Chicago and Eastern Illinois Railway Company and the Grand Trunk system. I have been connected with the Grand Trunk since 1884, the Chicago and Eastern Illinois since 1888. I know Alexander Sullivan, the defendant in this case. My first acquaintance with him was in court in 1896. I know this man, James J. Lynch, sitting there. I first became acquainted with him personally in 1898. I had known him before that by sight. I had some business in Judge Clifford's court in the month of February, 1898. I was interested on behalf of the Grand Trunk company in a case on trial there in the early part of February, 1898. I had a conversation with James J. Lynch in the office of Mr. Lynde, attorney for the Grand Trunk company, during the month of February, 1898, in the First National Bank building, at the corner of Monroe and Dearborn streets, Chicago. James J. Lynch was then a bailiff in Judge Clifford's room. He said to me, in substance, 'I can fix that jury for you in the Porter case for $150,' and he subsequently said he could fix the jury for $50 so that we would either get a disagreement or a verdict of not guilty, and I said to him, 'I won't have anything to do with you; talk to Mr. Lynde,' and he replied, 'I never do business with lawyers; I had an experience once that has taught me better than to do business with lawyers,' and he further said in that conversation that he was doing business and fixing

218—28

juries for the West Chicago Street Railroad Company; that he represented Mr. Yuille and the board of directors, and that the lawyers who were trying the cases were suckers; that they, meaning the lawyers, thought that they were winning the cases, 'but I,' meaning Lynch, 'am the thirteenth juror; I am the fellow who is winning the cases.' "

Other facts appearing in the record tend to confirm the alleged statement of Lynch to the witness Smith that he, (Lynch) in attempting to bribe jurors, was not acting under the authority of the attorneys of the street railway company. Lynch testified that he had corrupted jurors in from twenty-five to forty cases in which the West Chicago Street Railroad Company was defendant. He could name but five of such cases. He testified that his method was to approach jurors before they had been selected to sit in the cases; that he usually arranged to have two jurors to sit in the trial of each case; that he paid each of such jurors from $50 to $100 and kept the same amount for himself, and that he would notify the respondent which of the jurors had been so corrupted, in order that such jurors would be accepted by the attorneys for the railway company. It was proven that the respondent participated as attorney in the trial of but two of the five cases mentioned by Lynch, and that in one of such cases the jurors were examined and passed upon by other counsel; that in the other three cases mentioned by Lynch the jurors composing the panel before which the cases were tried were examined and selected and the cause tried by other counsel than the respondent, and that the respondent did not participate in the trial of either of said three cases. Counsel who tried those cases each appeared as witnesses and testified that no one attempted to inform them, or either of them, that any juror should be accepted or rejected, and that they accepted the jurors in each of such cases upon their own judgment, and that if any of such jurors had been tampered with, as alleged by Lynch, it was wholly unknown to them. Moreover, one of the cases spe-

cified by Lynch, and in which, if his statements be true, jurors were corrupted, was an unimportant case against the said street railway company for damages arising from a personal injury, in which the plaintiff, in the *ad damnum* of his declaration, claimed but $500, and in which the plaintiff offered to accept $150 in full settlement and on the trial of which the verdict was for the plaintiff in the sum of but $100. It seems incredible that the attorneys, having full knowledge of the comparatively trivial character of the case, would, to defeat the same, resort to a violation of the criminal law, which would expose them to the danger of punishment of such serious nature and consequences and require the payment of a sum of money almost, if not quite, equal to that which, in all probability, would result from a trial.

The reliability of Lynch as a witness and the value of his testimony were also affected by still another circumstance. By agreement between the relator and the respondent the transcript of the testimony given by Lynch on the trial of the respondent on the charge of conspiracy was produced as the testimony of Lynch on the issue between the relator and the respondent in this proceeding. Lynch then testified that seven indictments were then pending against him for bribing jurors. He stated that no promises had been made to relieve him from prosecution under these indictments, but that he had a hope of immunity therefrom because of the treatment that other witnesses had received from the State and because he thought he had rendered great public service by exposing jury bribing, etc. The indictments against Lynch remained pending against him as long as the criminal proceeding against the respondent was undetermined, and were thereafter dismissed on motion of the prosecutor for the State. How far the belief that the dismissal of these indictments and his immunity from punishment for crimes of which he was confessedly guilty affected or influenced his testimony cannot be known. That it had some influence and effect can scarcely be doubted.

Unless there be found in the record other testimony than that which we have reviewed, we would not be warranted in declaring that the proof established that the respondent had committed the crime of corrupting jurors or of conspiring with Lynch to commit that crime.

Lynch was induced to flee from the State, forfeit his bond given to secure his attendance to answer indictments which had been returned against him charging him with the crime of corrupting jurors, and to remain away until the period allowed for the prosecution of those who had conspired with him to commit that crime had expired. The relator contends that the proof shows that respondent, together with others, induced Lynch to so abscond and secrete himself. If there be found such proof in the record it would not only support the charge to that effect made in the petition, but would also have great weight, even controlling influence, in the state of the proof, in fixing upon the respondent the guilt of the charge of conspiracy to corrupt the jurors. The proof relied upon to show that the respondent participated in the alleged conspiracy to induce Lynch to abscond is the same as, and no more than, that which we have considered, whereby it was sought to show that the respondent and Lynch met at the respondent's office, at the office of Dr. St. John, at the office of Frederick St. John, at the office of Ross & Fitzpatrick's detective agency and at respondent's home, and that at these interviews the scheme and plan of arranging for Lynch to flee beyond the jurisdiction of the court were suggested and formulated and perfected. On the theory that this proof established the connection of the respondent with such alleged conspiracy, it is urged the alleged declarations of Edward Maher, George P. Murray, Mrs. Mary McGuirk and Frederick St. John should be received as declarations of co-conspirators with the respondent and given weight as testimony against the respondent. But we have found the proof was not sufficient to show that the respondent, at the interview had with Lynch at the respondent's office, made

the statements and suggestions relative to the plan to enable Lynch to abscond, as testified to by Lynch. On the contrary, the preponderance of the evidence disproved it. As we have also seen, the evidence was not sufficient to sustain the contention that the respondent had the alleged interviews with Lynch at Dr. St. John's office, at Frederick St. John's office, at Ross & Fitzpatrick's office or at respondent's house, being the only interviews relied upon to connect respondent with the alleged conspiracy. In such state of the proof, testimony as to the statements of other alleged conspirators would be but mere hearsay and inadmissible as against respondent.

Section 33 of the Criminal Code makes it a criminal offense, punishable by fine and imprisonment in the county jail or imprisonment in the penitentiary, to corrupt or attempt to corrupt a juror with intent to bias his opinion or influence his decision, etc. Section 272 of the said Criminal Code makes it a criminal offense, punishable by fine or imprisonment in the county jail, or both, to induce any person having knowledge of any fact tending to show the guilt or innocence of any other person to leave the State so that his testimony cannot be had, etc. The information herein charges the respondent with the commission of both of these crimes. The rule in Illinois, except as modified by statute in actions of slander or libel, is, that when a criminal offense is charged in the pleadings and must be established either to sustain the cause of action or maintain the defense, the presumption of innocence arises, and the crime charged must be proven by evidence which removes every reasonable doubt of guilt. (*Crandall* v. *Dawson,* 1 Gilm. 556; *McConnel* v. *Delaware Mutual Ins. Co.* 18 Ill. 228; *Harbison* v. *Shook,* 41 id. 141; *Sprague* v. *Dodge,* 48 id. 142; *Germania Fire Ins. Co.* v. *Klewer,* 129 id. 599.) Reasonable doubts as to the truth of the statements of Lynch can but arise. Even if no more than a mere preponderance of the evidence were required, we would not be justified in saying it is shown by that degree of proof that the respondent conspired with or

induced Lynch to corrupt jurors or to abscond from the State.

We find in the record a statement in writing signed by nineteen judges of courts of record in Cook county, namely, Judges Tuley, Windes, Baker, Ball, Kavanagh, Chetlain, Tuthill, Walker, Brown, Hanecy, Cutting, Holdom, Kersten, Gibbons, Brentano, Adams, Mack, Stein and Freeman, to the effect said judges had known, or known of, the respondent as a member of the bar of Cook county in active practice for twenty-five years, and that his professional character was never assailed to their knowledge until the charges here under consideration were made; that said respondent was never fined, rebuked or censured by any of said judges. The same statement, save that they had known the respondent only twenty years, was signed by United States Circuit Judge Grosscup and United States District Judge Kohlsaat, and also by Judge Orrin N. Carter, judge of the county court of Cook county, modified only by the statement that he had known the respondent fifteen years. It was agreed that this statement should be admitted in evidence as the sworn statements of said judges, subject, however, to the objection on the part of the relator that it was immaterial, irrelevant and not admissible as character evidence. The statement did not relate to the general reputation of the respondent for any trait of character, but only to the personal knowledge or personal belief of the signers thereto. It is but the personal testimonial of the signers, and we know of no rule of evidence that would justify us in receiving and considering the statement as legally admissible evidence.

The rule against respondent to show cause why his name should not be stricken from the roll of attorneys is discharged.        *Rule discharged.*